AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

FILED

Jun 10 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

United States of America
v.
JOHN ARTHUR HUDSON
a/k/a Art HUDSON
a/k/a J.A. HUDSON

*Defendant(s)*

Case No. 3-20-70747 JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 2011 through June 2018 in the county of San Francisco and elsewhere in the Northern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud<br><br>Maximum penalties: 20 years' imprisonment, $250,000 fine or twice the gross gain or loss, three years supervised release; mandatory $100 special assessment |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Jeffrey Chisholm

☑ Continued on the attached sheet.

/s
*Complainant's signature*

Jeffrey Chisholm, Special Agent, FBI
*Printed name and title*

Approved as to form [signature]
AUSA Eric Cheng

Sworn to before me and signed in ~~my presence~~ via telephone.

Date: June 9, 2020

[signature]
*Judge's signature*

City and state: San Francisco, California

Hon. Joseph C. Spero, Chief U.S. Magistrate Judge
*Printed name and title*

Print | Save As... | Attach | Reset

**AFFIDAVIT OF SPECIAL AGENT JEFFREY CHISHOLM IN SUPPORT OF CRIMINAL COMPLAINT**

I, Jeffrey Chisholm, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2004. For the last 15 years, I have been assigned to the San Francisco Division of the FBI, where I have been responsible for investigating complex financial crimes. During my career with the FBI, I have received specialized training in the investigation of financial crimes and have participated in numerous criminal investigations involving wire fraud, mortgage fraud, and money laundering. In those matters, I have submitted probable cause statements in the form of sworn affidavits to federal magistrate judges in the Northern District of California.

## PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an application for a criminal complaint charging JOHN ARTHUR HUDSON with wire fraud in violation of Title 18, United States Code, Section 1343, which occurred in or about April 2011 through at least June 2018, in the Northern District of California and elsewhere.

3. The facts set forth in this affidavit are based upon my training and experience as a Special Agent of the FBI, information provided to me by witnesses, and documents reviewed during the course of my investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, it does not include all the facts that I have learned during the course of my investigation. The witness statements and documentary evidence described in this affidavit are related in substance and in part only. I have summarized information, including information received from law enforcement agents and officers, documents, and records. I have set forth those facts that I believe are sufficient to support the issuance of the requested complaint, arrest warrant, and summons. I am not relying upon facts not set forth herein to support my conclusion.

## APPLICABLE STATUTE

4. Title 18, United States Code, Section 1343 makes it illegal to devise any scheme or artifice to defraud, and to transmit or cause to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

## BACKGROUND & RELEVANT PARTIES

5. JOHN ARTHUR HUDSON, who was also known as Art HUDSON and J.A. HUDSON, resided in the Northern District of California. HUDSON practiced law in Monterey County, California, after his admission to the State Bar of California in or about May 1979.

6. Victim-1 was an individual residing in the Northern District of California. Victim-2 was an individual residing elsewhere in California. Victim-1 and Victim-2 were the beneficiaries of a trust ("the Trust"), which became irrevocable upon the death of their father in 1989. The Trust was set to terminate by its terms in August 2019.




*Photograph of the Fillmore Property*

7. The Trust owned a commercial property on Fillmore Street in San Francisco, California ("the Fillmore Property"). The Elite Cafe, a New Orleans-inspired restaurant, was located at the Fillmore Property. Pursuant to the terms and conditions of a lease agreement, the

Trust received rental income from the owner of the Elite Cafe ("Tenant-1"). A significant portion of the rental income generated by the Trust was disbursed by the trustee to Victim-1 and Victim-2 in the form of beneficiary distributions.

8. HUDSON was nominated as successor trustee of the Trust after the prior trustee of the Trust became disabled in or about October 2010. HUDSON was formally appointed as trustee of the Trust by the Superior Court of California, County of Monterey, on or about February 18, 2011. In this role, HUDSON owed numerous fiduciary duties to the Trust and its beneficiaries, Victim-1 and Victim-2. HUDSON received annual fees as compensation for his role as trustee of the Trust.

9. Lender-1, a private lender, was an individual residing in the Northern District of California.

10. Victim-3 was an individual residing in the Northern District of California. Victim-3 was a legal client of HUDSON in matters unrelated to the Trust and the Fillmore Property.

**OVERVIEW OF THE SCHEME**

11. Between in or about April 2011 through at least June 2018, HUDSON knowingly devised and executed a scheme to defraud wherein he fraudulently obtained loans from lenders as trustee of the Trust. As part of the scheme, HUDSON pledged the Fillmore Property as security and falsely represented that the loan proceeds would be used to improve the Fillmore Property.

12. HUDSON obtained these loans as trustee of the Trust without the authorization or knowledge of Victim-1 or Victim-2, the beneficiaries of the Trust, notwithstanding his fiduciary duties to them and the Trust. With respect to the loans from Lender-1, HUDSON placed the Trust's assets at risk of loss and deprived the Fillmore Property of valuable equity, which was owned by the Trust for the benefit of Victim-1 and Victim-2.

13. In total, HUDSON caused at least $680,000 in loans to be obtained over multiple installments as trustee of the Trust. HUDSON personally profited from the loan proceeds and

did not use any of the money to improve the Fillmore Property.

14. The Trust sold the Fillmore Property on or about January 18, 2019. Approximately $633,000 in proceeds from the sale went to Lender-1 to pay off the loans obtained by HUDSON as trustee of the Trust. As a result of HUDSON's scheme to defraud, Victim-1 and Victim-2 received smaller distributions from the sale of the Fillmore Property than they otherwise would have received had it not been encumbered.

## FACTS ESTABLISHING PROBABLE CAUSE

Interviews of Victim-1 and Victim-2

15. On February 11, 2019, I interviewed Victim-1 and Victim-2. Both victims told me that, between approximately late 2010 and the middle of 2018, HUDSON made distributions to them from the Trust on a monthly basis. During this time, HUDSON made the monthly distributions; however, he always seemed reluctant to provide an accounting of the Trust's income and expenses. Victim-1 and Victim-2 repeatedly requested a formal accounting from HUDSON.

16. Occasionally, HUDSON provided written financial updates and tax documents regarding the Trust. None of these documents or communications disclosed the existence of any loans that HUDSON obtained against the Fillmore Property.[1] As an example, on or about December 10, 2016, HUDSON represented in an email to Victim-1 and Victim-2 that the Trust's bank account contained a balance of over $12,000.[2] Likewise, on or about June 12, 2018, HUDSON represented in an email to Victim-2 that the Trust's bank account contained a balance of over $12,000. Victim-2 went to a local Wells Fargo branch in an effort to independently verify the account balance. A bank representative informed her that the account contained much less.

17. At that point, Victim-2 suspected that HUDSON had violated his fiduciary

---

[1] Victim-2 used a Google email account ("Gmail account") to communicate with HUDSON. As part of my investigation, I contacted Google and was informed that the company did not have email servers in the state of California between July 1, 2015 and July 9, 2018. Therefore, I believe the relevant emails received by Victim-2 in the Northern District of California were transmitted via interstate wire communications.

[2] I obtained copies of bank records demonstrating that the balance was actually below $2,000.

responsibilities to the Trust. Shortly thereafter, Victim-1 and Victim-2 retained an attorney who uncovered information showing that HUDSON had improperly obtained multiple loans against the Fillmore Property.

Interview of Lender-1

18. On May 14, 2019, I interviewed Lender-1, who has operated as a private lender in the commercial lending business for approximately 35 years. Lender-1 advised that he loaned $250,000 to the Trust in approximately April 2011. In exchange for the loan, HUDSON executed a deed of trust on the Fillmore Property and a promissory note in Lender-1's favor. The note called for the Trust to make monthly interest-only payments and to repay the principal balance when the loan matured in May 2013. In the loan documents, HUDSON certified as trustee of the Trust that the loan was for the business of the Trust, that the loan proceeds were to be used for “routine upgrades,” “maintenance,” “property development,” “reserve,” and “business opportunity development,” and that no part of the loan proceeds were to be used for non-business purposes.

19. In or around March 2013, HUDSON contacted Lender-1 and requested an extension of the loan's maturity date to May 2015. Lender-1 agreed to the loan modification because HUDSON was making interest payments on a timely basis. At HUDSON's request, Lender-1 agreed to another loan modification in approximately March 2015 that extended the maturity date to 2017.

20. In or around May 2016, HUDSON asked for a third extension of the loan's maturity date to May 2019. He also asked for an advance of an additional $270,000 in order to make improvements to the Fillmore Property. Lender-1 was concerned that the advance would increase his loan-to-value ratio and thus the risk of losing money on his investment. Accordingly, he required assurances from HUDSON that the money would be used to make improvements to the Fillmore Property to increase its value. As a condition for making the advance, Lender-1 required HUDSON to submit paid invoices showing that at least $150,000 in loan proceeds was spent on improvements. It was also agreed that Lender-1 would withhold

$50,000 of the $270,000 until HUDSON provided copies of the invoices. Among other materials, HUDSON provided Lender-1 a list of cost estimates for furniture, fixtures, and equipment ("FF&E") and construction.[3] Based on HUDSON's assurances, Lender-1 loaned an additional $270,000 to the Trust in approximately July 2016 and they increased the amount set forth in the deed of trust on the Fillmore Property accordingly.

21. On or about October 27, 2016, Lender-1 received an email[4] from HUDSON advising him that the improvements were made to the Fillmore Property. HUDSON also provided Lender-1 with an invoice[5] relating to the improvements and requested Lender-1 to release the additional $50,000 that was withheld from the July 2016 advance. Lender-1 asked HUDSON for the invoice because he wanted to make sure that his money was used to improve the Fillmore Property. Based on HUDSON's representations that the advance was used for improvements to the Fillmore Property, Lender-1 mailed a $50,000 check to HUDSON on or about November 7, 2016.

22. On or about October 18, 2017, Lender-1 received an email from HUDSON in which HUDSON requested another advance to make more upgrades to the Fillmore Property. Lender-1 agreed to advance the funds and wired approximately $94,000 to HUDSON. They also increased the amount set forth in the deed of trust on the Fillmore Property accordingly. Lender-1 advised that HUDSON's representation that these funds would be used to make additional upgrades to the Fillmore Property was material to his decision to lend the money to the Trust.

23. The Trust sold the Fillmore Property on or about January 18, 2019. In connection with the sale, Lender-1 received approximately $633,000 from an escrow company to pay off the

---

[3] Based on materials obtained from Tenant-1 (described below in paragraph 25), I believe HUDSON sent the cost estimates under false pretenses, and provided such to Lender-1 to falsely represent that loan proceeds would be used to make improvements to the Fillmore Property.

[4] Lender-1 used a Google email account ("Gmail account") to communicate with HUDSON. As part of my investigation, I contacted Google and was informed that the company did not have email servers in the state of California between July 1, 2015 and July 9, 2018. Therefore, I believe the relevant emails received by Lender-1 in the Northern District of California were transmitted via interstate wire communications.

[5] Based on statements obtained from Tenant-1 (described below in paragraphs 24–27), I believe HUDSON sent the invoice under false pretenses, and provided such documentation to Lender-1 to falsely represent that loan proceeds were used to make improvements to the Fillmore Property.

outstanding loan balance owed by the Trust.

Interview of Tenant-1

24. On April 15, 2019, I interviewed Tenant-1 who was the general partner of an investment group that owned and operated the Elite Cafe. Tenant-1 advised that he sent monthly rent payments to HUDSON in accordance with a lease agreement that Tenant-1 had with the Trust.

25. Before acquiring the Elite Cafe from its previous owner in or around June 2016, Tenant-1's agent provided to HUDSON proposals regarding updating the restaurant.[6] After acquiring the restaurant, Tenant-1 hired a general contractor to renovate the restaurant. The work associated with the renovation began in approximately July 2016 and was completed in approximately October 2016. The cost of the project, including the purchase of new furniture and fixtures, was in excess of $500,000.

26. Tenant-1 and his investment group paid for the renovation of the Elite Cafe in its entirety. Neither HUDSON, nor the Trust, paid for any of the improvements.

27. At HUDSON's request, Tenant-1 emailed invoices[7] relating to the renovation, including the invoices he received from the general contractor, to HUDSON. HUDSON told Tenant-1 that he needed the invoices for insurance purposes.

Interview of Tenant-2

28. On May 14, 2019, I interviewed Tenant-2, the tenant of the Fillmore Property and owner of the Elite Cafe before Tenant-1. Tenant-2 advised that after HUDSON became trustee of the Trust, Tenant-2 sent monthly rent payments to HUDSON in accordance with a lease agreement that Tenant-2 had with the Trust.

29. Tenant-2 confirmed that the Trust did not pay for any improvements during the time period that HUDSON was trustee of the Trust.

---

[6] I obtained copies of the documentation sent to HUDSON in connection with the proposals, including cost estimates that I believe HUDSON provided to Lender-1 for the July 2016 advance under false pretenses.

[7] I obtained copies of the documentation Tenant-1 sent to HUDSON in connection with the renovation, including an invoice that I believe HUDSON emailed to Lender-1 on or about October 27, 2016 under false pretenses.

Interview of Victim-3

30. On May 6, 2019, I interviewed Victim-3 who advised that he hired HUDSON to represent him in a lawsuit against a water utility company after a water line owned by that company ruptured and caused damage to Victim-3's home. HUDSON filed a lawsuit on Victim-3's behalf in approximately May 2015. A settlement agreement was reached between Victim-3 and the utility company in approximately May 2016. As part of the settlement, the utility company agreed to pay him $195,000. Victim-3 received a settlement payment in this amount from HUDSON in approximately July 2016.[8]

31. In or around October 2017, HUDSON contacted Victim-3 via email with a business opportunity that was unrelated to his prior legal representation. As part of the proposal, HUDSON told Victim-3 that he was the trustee of a Trust that owned a building in San Francisco. He further represented that the Trust was in need of a $60,000 loan to pay for renovations to the building, including the replacement of an exterior sidewalk. HUDSON told Victim-3 that if he decided to loan the funds, the Trust would repay his money plus 10% interest in 30 days. Additionally, HUDSON told Victim-3 that the loan would be risk-free because it was secured by the property.

32. Victim-3 loaned $60,000 to the Trust in approximately October 2017 based on HUDSON's representations. HUDSON gave him a promissory note memorializing the terms and conditions of the loan. Victim-3 did not conduct any due diligence before he gave HUDSON the money because HUDSON told him the loan was risk-free. Moreover, Victim-3 trusted HUDSON because he was his attorney.

33. HUDSON defaulted on the loan extended by Victim-3 and has not responded to Victim-3's attempts to collect the outstanding balance.

Financial Analysis of HUDSON's Bank Accounts

34. As part of my investigation, I have traced the money obtained from Lender-1 and

---

[8] This transaction is discussed in further detail in paragraph 36 below.

Victim-3 to the following bank accounts controlled by HUDSON:

a) an account at Wells Fargo held in the name of the Trust with an account number ending in -0741 ("Account 0741"); and

b) an account at Bank of America held under the name "J A Hudson, Attorney Client Trust Account" with an account number ending in -5233 ("Account 5233").

35. Bank records for Account 0741 and Account 5233 show that HUDSON received at least $633,824.80 in net loan proceeds from Lender-1 and Victim-3 through the following transactions:

| Transaction Date | Amount | Transaction Type | Source of Funds | Destination Account |
|---|---|---|---|---|
| 04/26/2011 | $230,478.80 | Check | Lender-1 | Account 0741 |
| 07/21/2016 | $199,716.00 | Wire Transfer[9] | Lender-1 | Account 5233 |
| 11/07/2016 | $50,000.00 | Check | Lender-1 | Account 5233 |
| 10/25/2017 | $60,000.00 | Check | Victim-3 | Account 5233 |
| 11/17/2017 | $93,630.00 | Wire Transfer[4] | Lender-1 | Account 5233 |

36. Based on my review of the bank records, I believe that HUDSON personally profited from loan proceeds received from Lender-1 and Victim-3 and used most of the funds to pay for debts and expenses that were unconnected to the Trust. For example, the bank records for Account 5233 revealed that HUDSON used the funds he received from Lender-1 on July 21, 2016 to purchase a cashier's check in the amount of $195,000 payable to Victim-3. According to Victim-3, this payment represented the settlement he received from his lawsuit against the water utility company. However, the bank records show that HUDSON collected the actual settlement payment from the utility's insurance company nearly two months earlier, on or about June 2,

[9] As part of the investigation, I contacted the Federal Reserve Bank and was informed that the wire transfers occurring on July 21, 2016 and November 17, 2017 were transmitted through its Fedwire Funds Transfer System (FFTS). I was also advised that the Federal Reserve Bank had data servers in Texas, through which all FFTS transactions were processed during the period relevant to this affidavit.

2016. Instead of immediately disbursing these funds to Victim-3, HUDSON used them to settle an unrelated lawsuit with a former business partner, to pay his mortgage, and to issue checks payable to himself and his family members.

37. Similarly, the bank records for Account 5233 show that HUDSON used the $60,000 loan he received from Victim-3 on or about October 25, 2017 to pay the plaintiff of another lawsuit unrelated to HUDSON's representation of Victim-3, the Trust, or the Fillmore Property.

38. In total, I traced more than $370,000 in net loan proceeds from Lender-1 and Victim-3 to unrelated legal settlement payments, personal mortgage and credit card payments, checks payable to HUDSON, and other personal expenses. While a small percentage of the total net loan proceeds was traced to Trust-related disbursements, including monthly distribution payments to Victim-1 and Victim-2, none of the money received from Lender-1 and Victim-3 appears to have been spent on improvements to the Fillmore Property.

**CONCLUSION**

39. Based on the above information, I submit that there is probable cause to believe that JOHN ARTHUR HUDSON has committed wire fraud in violation of Title 18, United States Code, Section 1343. Therefore, I respectfully request that this Court issue a criminal complaint, arrest warrant, and summons.

s/

JEFFREY CHISHOLM
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 9th day of June 2020.

HONORABLE JOSEPH C. SPERO
CHIEF UNITED STATES MAGISTRATE JUDGE